Mitchell Kornblatt for Mr. Reed, may it please the court. This appeal involves a search warrant based on conclusory statements and material omissions that the government bootstraps with evidence the officer illegally obtained, and that's the Beaker Officer Boatman saw on Mr. Reed's back porch, which he was present on illegally sometime after midnight on September 7th, 2014. Just a factual legal type question on the record, which is I don't understand you to be challenging the actual swabbing or whatever they did of the Beaker. Your argument, I just want to be clear about this, is that the officer wasn't entitled to be on that particular part of the property. Is that correct? That's correct, Your Honor. Okay. I just wanted to be clear. The officer had an arrest warrant. That's true. Did the officer legally say the officer was okay? No, Your Honor, and the reason for that is because Officer Boatman, the government muddles these facts a little bit, so I think some background's important here. Officer Boatman went to execute the arrest warrant on Mr. Reed's property September 6th, the day before, sometime after 625, 630 in the evening, we don't know exactly when. He knocked on the front door. It appeared no one was home, and he left. Officer Boatman then returned sometime after midnight. We don't know exactly when. We know it was dark out because they had to use his flashlight, and for that second visit, Your Honor, he did not knock on the front door. He went around to the stairs that led to the back porch, and that's when he saw that beaker. So, no, he was not able to be on that back porch at that time for two reasons, Your Honor. One, he did not knock on that front door. Two, he had no reason to believe that somebody was inside when he went ahead and did that, Your Honor. So, his first search, Your Honor, and his second search, those are two distinct searches. And then after Officer Boatman left, Your Honor, he, a third officer, a second officer, around 625 the next morning, came, knocked on that front door, knocked on the back door, waited for Officer Parrish, who's ultimately the officer who executed the search warrant, and that's the officer who came to the front, to the back porch and hit the swab. Counsel, what law do we have on what constitutes a reasonable belief?  Is it currently, or is it probable cause-ish? It's a reasonable belief, and all— Well, yeah, but help me, I'm trying to get it in our normal way of thinking. Is it reasonable suspicion? Probable cause? Of course, it's not a preponderant search warrant, the higher stuff, of course. You think it's a reasonable suspicion that someone's home? Yes, Your Honor. And the reason— How come? And the reason for that is, in all the cases the government cites, and we cite, they're uniform to the sense that the officer knocks on the front door, the officer has some information or some belief that that person is present, such as another person tells them the person's there, they hear noises, they see lights, something to indicate that that person is present. And Officer Boatman had none of those things when he went around to the back porch. Was there a vehicle present that belonged to the resident? The record does not state whether the vehicle was present when Officer Boatman conducted that second search. The record states that the vehicle was present during the third search, which was Officer Vanderfelt's, Your Honor. Officer Vanderfelt's testified there was a vehicle in the driveway. He testified it appeared that Mr. Reed was not home, but because of the vehicle, it seemed as if he would have been somewhere on that property. However, this court cannot look at that third search by that second officer because that second officer is already tainted by Officer Boatman's illegal search, Your Honor. Officer Boatman took a picture, he texted Officer Parrish, who's the officer who came out. Eventually, he communicated with his sheriff's office, who then communicated with Officer Vanderfelt's when he started his shift. So when Officer Vanderfelt's went out to that property around 630 the next morning, he had already known what Officer Boatman had found. In the record, it states that he went out there to, one, execute the search warrant and secure the property because he had heard what Officer Boatman had already seen there. So Officer Vanderfelt's search, while there was a vehicle, in of itself, I don't think that provides cause. But even if Your Honor's were to find that, his search is invalid as well because it's tainted by Officer Boatman's search. Counsel, now I'm behind you, as you can tell. But does the district court find, the district court says Officer Boatman knocked on what appeared to be the possible front door of the residence and no one answered it? You're saying that's really the back door? Officer Boatman knocked on that first door when he first went to that residence sometime after 630 on September 6th. When he went back to the residence on September 7th, he did not attempt to knock on that front door. And Your Honor, I could provide you some transcripts. No, no. I think you're right. Go ahead. So when he came that second visit. I mean about what the district court's saying. Go ahead. I appreciate that. Yeah. No, go ahead. Went up the stairs and that's when he saw the back porch. So there is no factual dispute whether Officer Boatman knocked on that front door for that second search. He did not, Your Honor. And when you're reading the entire transcript, the officer knew which door is which. The government mentions in their brief that officers knocked on two alternate doors, not knowing which door and which was the front and which one was the back. And I think this is a problematic statement for a couple reasons. One, as I mentioned earlier, we're only dealing with one officer's search, that's Officer Boatman's. Two, we're only dealing with one search of his, and that's the second search. And three, if you review the evidentiary hearing transcript in its totality, the officer knew which door is which. On direct, Officer Boatman testified that for the search, he went to the back side to see if there was. I'm still behind you. Now, the district court doesn't specifically say whether there's a vehicle there or not, right? I don't believe that was in the report and recommendation, but it is in the transcript. The report and recommendation does lump some of these searches together. Correct. And I think that's problematic. I think for the Fourth Amendment, you need to look at each search in of itself and find whether... Even if they're by the same person? When they're six hours apart, Your Honor. What authority tells us that that time frame is too much, too little, or just right? Well, if you look at, let's say, for example, the Supreme Court case with the Rodriguez, the dog sniff case. That, the Supreme Court, I think the dog sniff extended the search five minutes, and they're parsing out every single minute. So I believe the Supreme Court does find that you need to temporally do a chronology, and each intrusion is a new search, Your Honor. So why is Vanderfelt's search negated? First, the reason why is because the Officer Boatman search taints Officer Vanderbelt's. Officer Vanderbelt knew what Officer Boatman had already seen. And what tells us that in the record? That's in the transcript, Your Honor. Who's testifying there in the transcript? It's in the transcript. That's correct. No, no. Who's the testifier? Officer Vanderbelt. Thank you. And Officer Vanderbelt said when he started his shift, he had learned what Officer Boatman had seen. I believe he didn't learn it directly from Officer Boatman, but someone else in the Sheriff's Department. He went out there to execute the arrest warrant and, quote, secure the scene. And the reason why he said secure the scene is because he had heard about the meth paraphernalia as far as the beaker goes, Your Honor. So it's tainted from that first search. It's fruit of the poisonous tree. Secondly, if Your Honors were to find it's not tainted, I do believe he does not have license to go to the back, because I don't believe that he had a reasonable suspicion or reasonable belief that Mr. Reed was home at that time. There is the truck in the driveway for his search the next morning, around 6.30 in the morning. But he testified. It did not appear that he was home. And just because the truck was there doesn't mean he was necessarily at the house, but somewhere on that property. In fact, the search warrant in this case describes that that front door is the front door. So I think it's misleading to say that the officers really had no clue which door is which. There is testimony in the transcript that the officers knew the back was the back when they identified various photographs. The search warrant in the case describes the residence, they're going to close that first door, the front door. And going around back without first knocking and without having any reason to believe that someone is home violates Mr. Reed's Fourth Amendment rights, and that's in cases like Cantrell. In the case the government primarily relies on Anderson, that actually comports with our argument because in that case, Anderson, they did knock on that front door. And the officers had information to lead them to believe that someone was home, a light was on, a dog was barking, but they had no reason to believe that name was home here. So he did not have any license to ground back for that second search after midnight in the dead of night. Well, he was executing an arrest warrant, right? That's correct. He was executing an arrest warrant. So is that a different basis for being able to be on that portion of the premises? No, Your Honor, because of Patton, Your Honor, they have to believe he's home. They have to knock on the front door first. That's in Cantrell. That's in a circuit case in Patton v. New York, they have to have some reason he's home to go around, rub to the back. I also want to briefly talk about knock and talk because the government references knock and talk cases as if to argue if this was an arrest warrant, it would still be permissible under knock and talk. It is not, Your Honor. Knock and talk is an implied license, like Girl Scouts selling cookies, that they can come to the front porch. Here they talk about knock and talk, but we're talking about in the dead of night. The timing here is not an implied license to go straight to the back and start banging on the back door. So I don't believe- Even if the gates open back there, right? Even if the gates open, that's correct. That's correct. I think in Collins v. Virginia, it's protected areas. It's not meant to be seen from the front view. And you cannot justify this as a knock and talk. One issue that I was having is Collins seems to apply to warrantless searches. It doesn't apply to situations where you have an arrest warrant that you're trying to serve. Does the argument you're making based on Collins, is it undermined by the fact that that's really kind of a curtilage, people aren't supposed to be there, but doesn't apply in the arrest warrant context? Well, it applies to the extent that it's protected by the Fourth Amendment, so the government needs an exception. And their exception is the arrest warrant. But I am arguing the arrest warrant doesn't fly here because they don't go through the proper procedures by knocking on that front door or having reason to believe that Mr. Reid was home when they went around in the dead of night to the back door. If you excise out the illegally obtained evidence, you're left with conclusory statements from a sheriff's office and a concerned citizen that have no detail whatsoever. Counsel, do we know who the concerned citizen is that is an employee at the prosecutor's office or not? I couldn't tell from the briefs. Her name was Carla. She was deceased at the time. At one point, she had been an employee, did not seem to have much of a movement in the  So it's not really an anonymous citizen, right? It is, Your Honor. But there is zero basis for why she's saying that, for her basis of knowledge, for why she's credible. So you have conclusory statements, the same kind of statements the Supreme Court found in Illinois v. Gatt, are not- Did the search warrant say an anonymous citizen? Is that why- A private citizen who wished to remain anonymous, Your Honor. Okay, thank you. Correct. So you cannot rely on those conclusory statements to support a probable cause finding. If you disregard the conclusory statements, if you take away the illegally obtained evidence, what you're left with are that the officer, when he executed the arrest warrant, saw on the front lawn an empty fuel bottle and empty bottles of heat. Now, campfire fuel, that is legal. We're talking about a rural area, the back country. Heat is a legal item. It's used for car repair. Disregarded heat bottles is in itself probable cause. Also plastic tubing, right? There was plastic tubing, and heat removes condensation from fuel lines. And what we argue, too, is that there was a Franks issue because the search warrant omitted that there were other automotive parts next to it, like seafoam, and seafoam- The problem I think I'm having with that is Franks is about misrepresentations. And I suppose an omission could rise to the level of misrepresentation if it was something that was absolutely exculpatory, but it seems to me that this automobile thing, you know, at the margins, maybe it's material, but it certainly doesn't rise to the level of misrepresentation for a Franks hearing. Why am I wrong about that? I think it does, Your Honor, when you take out the beaker and you disregard the conclusory statements, then all you have are disregarded bottles of heat without then adding in that there's seafoam and there's oil and there's other automotive repair components that are not involved in meth manufacturing, Your Honor. So if, but if we, if we leave the beaker in, like let's suppose we don't, we don't buy your first argument. If we leave the beaker in, then does your Franks issue kind of fall away? It is a problem, Your Honor. Okay. Thank you. Thank you. I'll reserve the rest of my time. Thank you, Mr. Korenblatt. Mr. Casey. Mr. Corp, Brian Casey on behalf of the United States, and I just want to start with addressing a few things that were, uh, uh, the appellant's counsel had said, and one of the first things I want to clarify is appellant's counsel used very liberal use of the term search. The officers did not conduct searches. She talked about the three searches. They weren't searches under fourth amendment law. They weren't searches. The officers had the ability to go to the home to execute the arrest warrant and in So if you look at the Supreme court and this court's curtilage cases, the question is, was there a legitimate law enforcement purpose to enter the curtilage? One legitimate law enforcement purpose that often comes up in these cases is to knock and talk, to go knock on the door, to talk to the resident, to do some investigation that way. Here we have the execution of the search warrant. So the officers are approaching the house and are able to enter the curtilage and there they are doing a legitimate, executing a legitimate law enforcement purpose of executing this arrest warrant. Well, one of the problems I have though, is the, is the, is the fact that, um, at least on one of the types, I think the one in the middle of the night, the officers went directly to the back door rather than the front door. Why does that not present a problem? Well, there's a number of reasons it does not present a problem. And one of them is the officer's testimony is he didn't know what the front door was and the district court, uh, found that. So this is a, this would be a finding that would need to be reviewed for clear error. There's nothing in the record to contradict it. The officer said he went to, and if you look at the pictures, this is a, uh, uh, this is a remote location. This is not a house. It's on the street. There is no curb. There is no frontage. The driveway goes, you know, kind of goes through what we'll call the front for purposes of this. But it goes to the first entrance and then wraps around to the back entrance and that's where the truck. I thought the driveway by the pictures doesn't reach to the back entrance. It does, Your Honor. Oh, it does. You'll see a little more carefully. That's where the truck is parked. And there's paths, there are pathways to both the front, the first entrance and to the stairs to go up to the back entrance. And so this officer, um, law is clear. They got to try the front door first. No, Your Honor. I do not believe. Oh boy. Doesn't Robbins say that Peyton and Lloyd, we got four or five cases that say you got to try the front door first. Your Honor, I don't think they say you have to try the front door first. Boy, doesn't Robbins have a direct quote. Tell me, tell me if I'm wrong, but doesn't Robbins have a direct quote that says it was reasonable. You got to think they're there and you've got to go to the alternative entrance following an unsuccessful knock at the front door. I'm quoting. Tell me why that doesn't apply. They said it was reasonable because they went to the, going to the alternative entrance in those cases was reasonable because the touchstone here, there is no, uh, a bright line rule that you have to go to the front door first. In those cases, it's reasonable to go to an alternative entrance because they tried the front door and it wasn't, uh, they didn't get an answer. And so the idea is, was that intrusion into the curtilage, uh, again, a legitimate law enforcement purpose and it's fourth amendment. So the touchstone is always reasonableness. Was it reasonable? What made it reasonable in those cases was the fact no one entered the front door. This court has other cases. I mean, I know one of the cases that, uh, the appellant really relies on is the Wells case. And I think the Wells case is really illustrative of this point because the Wells case says of the officers who weren't there for, I mean, uh, Wells, the officers were there to conduct a search. Um, but it still said they had, even though it was the middle of the night, they had the implied license to enter those sections of the curtilage where a visitor would normally be able to enter the driveway, the walk to the front door. And it said in Wells, the officers enter the driveway, they walk up the driveway, they walk past the pass to the front door. They could have taken the pass to the front door and knocked on it. They didn't. And then they walked past the second door, which was his buddy in the driveway. Again, the court saying that they could have knocked on that door because it was something they had access to, uh, through your normal was, you know, just implied license. Um, and they didn't. And so it was when they entered the backyard with no legitimate purpose and not having taken the opportunities to knock on the door, that is where they violated the fourth amendment in Wells. Here, we have two entries. Both have paths to them and, and, uh, testimony of unrefuted testimony. The officer didn't know which one was the first entry was the primary residence. So a lot of the cases, um, rather than talk about front door, they talk about primary entrance. This officer didn't know what the primary entrance was. And so he tried them both. And I think that, um, that's entirely reasonable under this circumstance. And there was no requirement, uh, temporal or otherwise that he, that not knowing which pick's right. It was reasonable for him to try them both. He didn't have to guess which one was right. Um, and he wasn't sure. And that was the court's finding. Um, but secondly, on, um, um, I also think the record does not support, um, what happens in the book, what the appellate's description of what happens in the morning. Um, Officer Vanderfelt's the second officer in the morning. He gets to work at 6 a.m. He hears from a sheriff, go back out there, execute this arrest warrant. And what the, the record says is the sheriff told him that, uh, uh, Officer Boatman from the night before had seen items. Go see if those items are still there. It does not say, and there's nothing in the record that says that, uh, Vanderfelt's was specifically told there is something on the back porch or specifically told anything about the beaker. Um, the other items that were seen were seen on the, um, seen in, you know, where, where the officer parked on their walk to the house, they encompass, uh, uh, encountered it. The heat bottles, the Coleman fuel bottle, and the tubing. And they did this knowing and having background that this individual was involved with or, or could have been involved with meth manufacture. So these were immediately red, red, red flags that entered, uh, that, uh, arose for all of the officers. And in their testimony shows it. The second they saw these items, they're immediately thinking, this is indicative of meth manufacturing. And that is enough. So it could be the case that those were the items that were referred to. The record doesn't say. And so Vanderfelt's has a completely independent going in the morning, a completely independent purpose for, uh, um, uh, going out to that house to serve the arrest warrant. Anything you could possibly be tainted with is this very amorphous, well, there are items to look for. He's not specifically told go to the back porch and look for a beaker. That's not in the record. The district court didn't find it. There's no evidence of that in the record. Suppose we had that though, would, would, uh, would the, would the search then be invalid or the, the, the, the thing they did with the beaker, the swabbing of the beaker, would that be invalid? Um, the swabbing of the beaker, um, I think the way to best put it, your honor is if you put the officer within fourth amendment on the back porch, then the swabbing of the beaker is okay. Um, the reason is every officer that testified said the incriminating nature of that beaker was readily apparent. And so, um, they basically saw that and said, that's evidence of a crime. And that's what gave them the probable cause under the plain view doctrine. Plain view is you need, you know, you need to lawfully within the fourth amendment, be in that location. Um, and then you see something and in plain view, if it's incriminating nature is readily apparent, then you'll have the probable cause to seize that item. And so in this case, um, they didn't physically seize it. Instead, they did a limited search. But, uh, if, uh, the officers are able to be on the back porch and by the next morning, they clearly are able to be on the back porch because Vander, uh, Vanderfelt says, I saw his truck there. It's a remote location. I thought he was there. Um, I knocked on the front door repeatedly. I tried the windows, I tried the back door. Um, and so this was all, you know, just a legitimate execution of an arrest warrant. Um, and I also want to, uh, take some issue with the claim that, uh, about the officers having to know that the person was there or having a certain suspicion that the person was there. Um, those, that law pertains to when an officer has a valid arrest warrant and then can actually enter the house. It says our cartilage, right? The Supreme court says the cartilage or even the residents. So it includes the cartilage council. That's what the Supreme court established the rule. But I think it's reasonable to, to, when you're trying to execute arrest warrant, to go to someone's house and knock on it. I don't think that there's this added requirement that you need to state, well, I really thought he was at his house to execute an arrest warrant. Well, the rest of the sentence says a reasonable belief. The suspect resides in the currently present. Tell me if we're not communicating. I'm reading you what the Supreme court says. Well, I'm sorry, which case are you reading from? Yeah. I'm reading from Peyton. I think Lloyd, our court of Lloyd, quoting Peyton. Well, I, I think Peyton, your honor may be corrected, but I believe Peyton involves entering the home. Yeah, of course it does. Yes. Well, an entry of the cartilage is while it is still protected by the fourth amendment, the standard for it is lesser than it would be to enter the home. And so you can walk up and knock on a door of someone's residence, I think it's a fairly reasonable thing to do. Um, and if you're trying to execute an arrest warrant, I don't think there's this added requirement that you have to have something that you can point to and say, well, I was given a tip that he was home to go and actually know it's reasonable suspicion. Your opponent says it's reasonable suspicion that the suspect resides in and is currently present at the dwelling. I think it's just a normal fourth amendment reasonableness. Was this reasonable? Well, you think it's reasonable suspicion to counsel. We don't need to query. I think reasonable suspicion as in the Terry standard, I think was, is too high a standard here. I don't think that they need to have specific pretty low standard council, but, but it does require specific, specific, articulable facts. And if we want to go there, we can say it's their house. I know it's their residence. And if that is a sufficient articulable fact, um, then, then yeah, but if we need more than that, then I don't think there's, I'm not aware of any case that requires that, um, to execute it, to go to someone's house and knock on it for the purposes of executing a warrant. I mean, it's indisputed that it was his residence, so that might be the sufficient, maybe that If there's any other questions about sort of getting to the back porch and the beaker, I can address some of the other, uh, uh, arguments that were made. Is there anything to indicate that Vander Feltz knew about the beaker before he went that next morning? Excuse me, Your Honor. Which officer? Vander Feltz. Uh, there's nothing in the record. What the record says is that he was told there were items there, um, and it doesn't say which particular item, and as the record shows, there were a lot of items there, um, and the only one that, that's, you know, is even, there's even an argument could be problematic, and it's not, but there's even an argument is the beaker. I don't think there's any real argument that seeing the heat bottles, the, uh, Coleman fuel can or the tubing is, is, is Fourth Amendment problematic at all. Did they say, did he say, did he know that there were items on the back porch or that there were items at the house? Uh, items that, that, that, uh, uh, nothing about the back porch whatsoever. Okay. So I don't think, I think that's definitely an independent source. I don't think that Vander Feltz approach to the house is tainted, um, in the way that the appellate suggests. Is good faith exception applicable here or a possible consideration? Absolutely. Your Honor. Um, this warrant, I think the warrant on his face has probable cause, but it certainly does not. He's not so lacking of probable cause or based upon any abdicate of the judicial role or based upon any, um, uh, attempts by the officers to provide a false information, uh, that would take it outside of Leon. This was absolutely a K a warrant that was executed in, in good faith. And with regard to some of the other information in the warrant, um, I think the claim is that some of the tipster information was not corroborated. And again, that's contradicted by the record. Um, the officers had, uh, again, they've been hearing, they've been hearing chatter. It's a small, it's a rural area, part of Missouri. Uh, they've been hearing, hearing chatter. Heard reports that this person was either involved in the manufacturing of meth or hanging out with people that were known to be involved in the manufacture of meth. Um, and they corroborated that. So the claim the appellate makes is that's uncorroborated. Well, it's highly corroborated. It's corroborated, um, both by the fact that, uh, you had the specific, uh, uh, tip from the MFA people saying, Reed is coming in and buying, uh, boxes of heat. And that's not something I know they, uh, appellate says, well, that's normal automotive repair. We'll buy it by the boxes. Um, you know, if a bottle of heat that lasts years, uh, if you're just, you know, treating your own automobile, it certainly is not something you run through by the box. And so the MFA employees, uh, pointed that out to the officers. Um, in addition, it was corroborated by the fact that, uh, they got a very specific tip. Now we say anonymous, the officers knew who it was. They didn't put the name in the warrant and they weren't required to, but a, a, a, a concerned citizen gave a very specific tip that Reed was manufacturing on his residence. Um, and that type of citizen tip, um, this court, uh, has, has reflected, has a certain reliability because it's not an informant who's trying to make a deal. It's not an informant who's trying to be paid. It's a concerned citizen who comes in and that alone concern, uh, contains an added degree of reliability. But then those tips were further corroborated by the fact of what the officer saw when they got to the residence. And they saw the heat bottles, they saw the tubing. Um, they saw the Coleman fuel can. And that, again, it further corroborates the tips of this. So to say that these were uncorroborated, uh, tips is just simply uncorrect in this record. Um, it was, it was absolutely appropriate information, uh, for the officers to put into the warrant and for the, uh, state court to consider. Um, and then lastly, that was, uh, a suggestion that, uh, the officer parish who swore out the warrant made a false statement. Um, um, the district court found that when he said several months and probably more appropriately should have said several weeks, uh, that that was not the type of intentional false statement, uh, that would, uh, uh, cause any concern for this warrant. Um, and I think the district court's finding is, is sound and certainly not clear in that regard. Um, if there's, uh, nothing else for me, I see my time is about to expire. Thank you, Mr. Casey. Thank you, Your Honor. Ms. Cornblatt, your rebuttal. Your Honors, I would like to briefly clear up the district court did not find that the first officer, um, did not know which door is which. If you read the report and recommendation, it said upon reads, upon arrival at Reed's residence, Officer Bowen. Which page are you, Counselor? I'm sorry. I'm on the, uh, the first page of the report and recommendation, actually. Okay, great. Go ahead. Which would be addendum number seven, page seven. I'm with you. Upon arrivals at Reed's residence, Officer Bowen testified that it was not immediately apparent which entrance to the residence was the front and which was the rear. But then when you turn that page, that second paragraph, last sentence, Officer Bowen then knocked on what appeared as the possible front door of the residence, but no one answered. And then the next paragraph, when he returned later in the early morning hours of September 11th, 7th, to fulfill the arrest warrant, he went around to what appeared to be the back side of the residence. And that tracks the testimony of the officer describing the front versus the back. Also, um, with respect to, um, evidentiary testimony about the, um, store employees mentioning Mr. Rack, Mr. Reed bought heat. You cannot use that, Your Honor, to, um, backdoor the, the, uh, the tips here because they did not include that information in the search warrant. The search warrant is completely conclusive. It has no details about what the tips were. So we cannot rely on the evidentiary hearing to then backdoor that information. Finally, real quickly, there is no good faith here. Officer Parrish knew about the illegal searches. Officer Boatman texted him that night. They texted the next morning. Vander Felt pulled Officer Parrish down to show him what he had seen. Officer Parrish went around to the back porch. They waited there for two hours before Mr. Reed eventually came out. Your Honor, so Officer Parrish cannot claim that he had good faith. And once you excise out that information about the beaker, there is, the search warrant is lacking a probable cause here. Thank you. I ask that you vacate the judgment and reverse the district court. Court wishes to thank both counsel for the argument you provided to the court and the briefing that has been given to the court in this case. And we'll take it under advisement. I may be excused.